**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| BMO Harris Bank N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| Eric Eimen and Monica Kaminski, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>**

Plaintiff BMO Harris Bank, N.A. ("BMO") brings this Complaint to redress Defendant Eric Eimen's ("Eimen") and Defendant Monica Kaminski's ("Kaminski") (collectively "Defendants") blatant violation of confidentiality and restrictive covenants contained in written agreements with BMO. Defendants also have misappropriated BMO's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* Defendants have used BMO's confidential information and improper tactics to solicit and persuade BMO's long time wealth management clients to transfer their accounts to their new employer, BMO's competitor William Blair & Company ("William Blair"), and to service those clients, in violation of express provisions of agreements each executed. The Defendants' misconduct also has caused significant financial losses to BMO that they must pay, and they also should be enjoined from any further wrongdoing that will deprive BMO of its goodwill, customer relationships, and confidential information.

## I.    THE PARTIES

1.      BMO is a national bank organized and existing under the laws of the United States with its headquarters and principal place of business in Chicago, Illinois.

2.      Eric Eimen is an individual and former wealth management employee of BMO who is a citizen of Illinois. Eimen resides, on information and belief, at 5511 Renee Ave., Crystal Lake,

1

IL 60014.  Eimen is a party to an employment agreement with BMO that he executed on November 10, 2015, a true and correct copy of which is attached as Exhibit A ("Eimen Agreement").

3.      Monica Kaminski is an individual and former wealth management employee of BMO who is a citizen of Illinois.  Kaminski resides, on information and belief, at 200 Bennett Ct. N., Oswego, IL 60543.  On February 3, 2020, Kaminski executed a written Non-Solicitation Agreement with BMO in return for additional compensation.  A true and correct copy of Kaminski's Non-Solicitation Agreement is attached as Exhibit B ("Kaminski Agreement").

4.      Both Eimen and Kaminski gave simultaneous notices of resignation from their employment at BMO on April 6, 2022, effective June 6, 2022.  Neither would disclose to BMO where they were going.  Shortly after June 6, 2022, both went to work for William Blair as part of that company's wealth management function.  William Blair provides products and services that are competitive with those provided by BMO.

## II.      JURISDICTION AND VENUE

5.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331 because some of the plaintiff's causes of action sound under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.  The court has pendant jurisdiction over the remaining state law causes of action.

6.      This Court has personal jurisdiction of each Defendant under the Illinois long-arm statute, 735 Ill. Comp. Stat. 5/2-209, as well as under the DTSA.

7.      Venue is proper in the Northern District of Illinois under 28 U.S.C. 1391 because both Eimen and Kaminski reside in this District.  In addition, a substantial part of the events giving rise to the claims in this Complaint took place in this District.

### III.    FACTUAL BACKGROUND

**A. Eimen's Employment at BMO and His Agreement.**

8.    Eimen was hired by BMO on September 8, 1992.   Over the years of his employment, he worked in various roles at BMO, including as a retail banker and private banker. In 2011, he became a Wealth Advisor at BMO.

9.    In November 2015, based on discussions between the parties, BMO gave Eimen a new job title of Private Wealth Advisor, Director/Private Wealth Advisor, pursuant to a letter to which BMO and Eimen mutually agreed and which is referred to herein as the Eimen Agreement. The Eimen Agreement is attached hereto as **Exhibit A**.

10.    The new title, and the terms of the Eimen Agreement, were effective on November 1, 2015.  Eimen executed the agreement on November 10, 2015.

11.    The Eimen Agreement required that Eimen

must protect the confidential and proprietary information of BMO Harris Bank, our clients, suppliers and employees.  Confidential and proprietary information includes, but is not limited to, customer identities or customer lists, information concerning BMO Harris Bank's customers (such as financial information, customer profiles, and account information), sales and marketing strategies and plans, and personnel information or data). You must comply with all laws and BMO Harris Bank policies that restrict the use, disclosure, collection and access of confidential and proprietary information.

12.    The Eimen Agreement required sixty days' notice of resignation to ensure orderly transitions of BMO clients serviced by Eimen to other wealth managers.

13.    The Eimen Agreement contains an express "Non-Solicitation" provision to which Eimen agreed:

In consideration for your continued employment with the Company and other good and valuable consideration, you agree that during your employment and for twelve (12) months following the end of your employment with the Company, you must not, directly or indirectly, for yourself or for any third party: (i) solicit, induce, or attempt to induce any customer of the Company with whom you have dealt on behalf of the Company, serviced, had responsibility for, or about whom you received confidential information, to stop doing

3

business with or through the Company, or to do business with any other third party or entity that provides products or services competitive with those provided by the Company; (ii) provide service to any customer of the Company with whom you have dealt on behalf of the Company, serviced, had responsibility for, or about whom you received confidential information, which is competitive to the services provided by the Company; or (iii) solicit, recruit, induce, or attempt to induce any person in the employ of the Company to terminate his/her employment. . . .

14.     The restriction barring Eimen from servicing BMO clients for a competitor is reasonable, as there are a large number of other wealth management advisors with which the general public is free to do business.

15.     The Eimen Agreement also provides that if he is found to be in violation of the agreement, he must pay BMO for all damages, costs, expenses, and reasonable attorneys' fees incurred by BMO in enforcing the agreement and prosecuting any action or claim arising by reason of a violation of the agreement.

16.     BMO performed all of its obligations to Eimen, including all conditions precedent under the Eimen Agreement.

17.     The Eimen Agreement is supported by adequate consideration, is reasonable in scope, and is not more extensive than is reasonable and necessary for BMO to protect its legitimate business interests, including but not limited to its confidential information and trade secrets, customer relationships, and goodwill.

18.     As a Private Wealth Advisor, Eimen's job responsibilities included solicitation of investment assets from new and existing customers, introduction of BMO team members and additional wealth management services to BMO clients, adherence to all required legal and compliance regulations pertaining to BMO Harris Bank N.A., and maintaining good working relationships with his clients and colleagues.

19. During his employment, Eimen provided investment advisory services to BMO's high net-worth clientele in its wealth management group.

20. These individuals are a select and private group of customers. Their identity and information about their wherewithal is kept confidential by BMO and only those who require access to their information to serve these customers are given access to it. Such information, including information about the fees BMO charges these customers, the amounts they have under management, and their investment choices all are quintessentially confidential information belonging to BMO that cannot and must not be shared outside of BMO and certainly not with competitors.

21. Eimen remained in his role as Private Wealth Advisor, subject to his non-solicitation and confidentiality obligations continuously, until June 6, 2022 – sixty days after his notice of resignation on April 6, 2022.

**B. Kaminski's Employment at BMO and Her Non-Solicitation Agreement.**

22. Kaminski was hired by BMO on August 20, 2012, as a portfolio manager in BMO's wealth management function.

23. Kaminski was assigned to work closely with Eimen to support the wealth management clients he serviced for BMO.

24. On February 3, 2020, BMO extended an opportunity for Kaminski to receive additional compensation in her role as a Portfolio Manager in US Wealth Management.

25. In return for an increased base salary, Kaminski executed a Non-Solicitation Agreement, made and entered on February 3, 2020 (the "Kaminski Agreement"). The Kaminski Agreement is attached hereto as **<u>Exhibit B.</u>**

26. The express consideration for the Kaminski Agreement was Kaminski's continued employment, the increase in her base pay, and BMO's disclosure to Kaminski of its proprietary information, Confidential Information, and trade secrets – all of which allowed Kaminski to perform her duties for BMO.

27. The Kaminski Non-Solicitation Agreement recognized that BMO "has invested substantial time, effort, and expense in assembling and training its present staff of personnel, and in obtaining and fostering a strong client base and goodwill."

28. In order to protect that investment, in Paragraph 1 of the Non-Solicitation Agreement, Kaminski agreed to the same non-solicitation obligations that Eimen had. She promised that, for 12 months after leaving BMO, she would not solicit, induce, or attempt to induce a BMO customer with whom she had dealt, serviced, or had responsibility or about whom she had Confidential Information to leave BMO. Likewise, Kaminski promised not to provide service to any such customers in the 12 months after leaving BMO. Kaminski also agreed not to solicit, induce or attempt to induce any employee to terminate his or her employment by BMO to go work for a competitor – the same promise Eimen had made.

29. As with Eimen's agreement, the restriction barring Kaminski from servicing her BMO clients for a competitor is reasonable, as there are a large number of other wealth management competitors with which the general public is free to do business.

30. "Confidential Information" is defined in the Kaminski Non-Solicitation Agreement as:

> information which the Company regards and treats as confidential and which is not generally known or accessible to competitors or other third parties not having a legitimate need to know; which has value to the Company due to it not being generally known to the public or other persons who can obtain economic value from its disclosure or use; and which, if disclosed, would result in competitive and business disadvantage to the Company. Confidential Information includes, by way of example and without limitation, the

following: non-published financial information relating to the Company . . . information about the Company's products and/or services, including but not limited to development plans, product designs, costs, and pricing policies; and client information, including but not limited to data regarding actual or potential clients. Confidential Information does not include information which can be demonstrated by Employee to have been known to Employee prior to Employee's employment with the Company or information that is or becomes generally available to the public through no act or omission by Employee.

31.    The Kaminski Agreement is governed by Illinois law and permits both injunctive relief and money damages as remedies, including but not limited to disgorgement of any profits, commissions, or fees realized by Kaminski.

32.    Kaminski acknowledges in the agreement that BMO "is engaged in a highly competitive business, and the covenants and restrictions contained in Paragraph 1 are reasonably designed to protect the Company's legitimate business interests, including the Company's goodwill and client relations, Confidential Information and trade secrets, and the knowledge gained by Employee during Employee's employment."

33.    The Kaminski Agreement also establishes that she read the agreement before signing it and had the opportunity to have legal counsel review it prior to her signing it.

34.    BMO performed all of its obligations to Kaminski, including all conditions precedent under the Kaminski Agreement.

35.    The Kaminski Agreement is supported by adequate consideration, is reasonable in scope, and is not more extensive than is reasonable and necessary for BMO to protect its legitimate business interests, including but not limited to its confidential information and trade secrets, customer relationships, and goodwill.

36.    As a Portfolio Manager, Kaminski was the key point person for BMO wealth management clients, providing day-to-day investment management to BMO clients and supporting wealth managers in BMO's Barrington office, to which Eimen also was assigned.

37.     As a consequence of her role and the confidential information she was provided, Kaminski has detailed knowledge of client portfolios, investment goals, and actual investments, as well as the internal workings, pricing, and strategies of BMO.

**C. BMO's Investments in Eimen and Kaminski and its Clients, and Defendants' Access to Confidential Information.**

38.     BMO made significant investments into Eimen and Kaminski, as well as its clients, during the years these two employees were part of the BMO wealth management function.

39.     BMO spent substantial sums to support Kaminski's social activities – including frequent golfing outings – with clients.

40.     BMO also expends substantial sums annually on exclusive client events – one of many ways in which the bank invested in its clients to retain them while Eimen and Kaminski worked at BMO.

41.     BMO also supported and invested in Kaminski in obtaining and maintaining her status as a Certified Financial Analyst.

42.     Both Eimen and Kaminski were provided access to weekly calls with BMO's Chief Investment Officer and Chief Strategist, who shared highly confidential information about the bank's investment analytics and strategies.  BMO does not publicly share such information. Portfolio Managers like Kaminski also participated in regular calls advising on how to construct client portfolios.

43.     Eimen and Kaminski also are privy to the highly personalized rate structures applied to BMO's wealth management clients.  How the bank establishes pricing and rates for its services is tailored specifically to its clients, and no one who had not worked for those clients at BMO would know what those customized rates and fees are.

D. **Eimen's and Kaminski's Resignation Notices and Departures for William Blair, a Competitor.**

44.     On April 6, 2022, Eimen called the head of the BMO Barrington office to give notice of his resignation.  He refused to say where he was going.

45.     Approximately an hour later, Kaminski called the same BMO supervisor in the BMO Barrington office to give notice of her resignation.  She also refused to say where she was going.  Notably, Kaminski cried during the call and seemed reluctant about the decision to leave.

46.     On the same day, Eimen and Kaminski sent identically worded notice emails to their ultimate supervisor at BMO, at the same time, stating, "Please accept this letter as my sixty (60) day notice of resignation from BMO Private Bank, effective immediately.  Because I will continue to be employed by BMO during this sixty (60) day period, I will need you to advise me as to how, and in what manner, I should carry out my obligations to the clients I current serve."

47.     On April 12, 2022, outside counsel for BMO sent letters to Eimen and Kaminski reminding them of their obligations to BMO under their respective agreements.

48.     According to his LinkedIn profile, Eimen is part of something called the Eimen-Kaminski Group at William Blair, which "specializes in providing comprehensive and customized investment and wealth planning strategies. I have over 25+ years of experience in the wealth management industry and enjoy partnering with clients to understand their goals and objectives and how that information will help guide their overall wealth management relationship. Prior to joining William Blair, I spent 29+ years with the BMO Wealth Management division as a Director-Wealth Advisor advising corporate executives, business owners, and high net-worth families on investment strategy and wealth management solutions."

49.     Eimen thus does the same work at William Blair that he did at BMO, working with the same BMO support person he apparently induced to join him at William Blair, and trading on his prior BMO position to do so.

50.     Today, according to her LinkedIn profile, Kaminski is a "Wealth Advisor with William Blair's Private Wealth Management group, where I specialize in constructing and managing investment portfolios for high-net-worth individuals, families, and organizations, working closely with them to craft customized portfolios tailored to their specific financial objectives as part of an overall personal wealth management strategy."

51.     In short, Kaminski also is doing the same work at William Blair that she did at BMO.

**E.  The Defendants' Use of Confidential Information and Solicitation and Servicing of BMO Clients in Violation of their Agreements.**

52.     BMO did not learn that the Defendants were joining a competitor until after they did so.  A William Blair announcement, dated June 7, 2022 – just one day after the notice period had ended – stated that Eimen and Kaminski were "our newest team to PWM in Chicago."  The announcement said they left BMO, "where they stewarded a client roster of high-net-worth families and business owners. . . in order to expand capabilities for their clients and gain access to a collaborative group of deep resources."

53.     The implication is that BMO had fewer capabilities and resources than William Blair.  To the extent that this announcement was sent to any BMO client, it would constitute an improper solicitation as it does more than merely report where the Defendants had gone.

54.     Within weeks of joining William Blair (and in at least one instance even before), Defendants began soliciting BMO customers to leave BMO and move their assets under management to William Blair.

10

55.     On June 17, 2022, outside counsel for BMO wrote to Eimen and Kaminski to alert both that BMO had become aware that they had violated their post-employment obligations to BMO, including contacting clients and using or disclosing BMO Confidential Information.  BMO, through counsel, demanded that these violations cease immediately.  They did not.

56.     Clients who have left, and those who have not, have reported that Eimen and Kaminski solicited them.

57.     Regardless of who initiated any discussions about leaving BMO, Eimen and Kaminski now are servicing clients to whom they provided services at BMO, in direct violation of their agreements.

58.     Virtually none of the clients who have left and those who have reported having been contacted by Defendants were brought to BMO by Defendants.  Many of these clients have been with BMO for decades and were referred to the Defendants by others at the bank.  Among the clients who have left are individuals who have been with BMO since 1970; 1986; 1988; 1995; and 1996.

59.     In at least three instances, clients used emails from Kaminski laying out how they were to close their accounts with BMO, demonstrating her use of BMO's confidential information to effectuate their departures – in violation of her Agreement.

60.     Other clients who had been entirely satisfied with BMO prior to the Defendants' departure, all of a sudden expressed displeasure.  In one case, a departing client reported that after speaking to Eimen, they felt William Blair would be able to provide personalized attention and a "better" fee structure.

61.     In another instance, a client explained they were leaving because "Monica [Kaminski] sold me" on moving to William Blair.

62.     Many of the account transfers and solicitations took place even after Defendants were warned that they risked legal action for their misconduct.  In one instance, for example, a client said he had received an email from Eimen on September 14, 2022 – months after BMO first began demanding adherence to its agreement with Eimen.

63.     On information and belief, clients were coached by Defendants to begin saying they were not solicited by Defendants, but rather reached out to the Defendants themselves.  In at least one instance, a client claimed to have found Eimen on LinkedIn – a claim that was hard to credit since that client does not have a LinkedIn account.  Another initially said Eimen had reached out to him, but later said the opposite.

64.     Defendants also have not taken "no" for an answer from their former BMO clients. In one case, in July 2022, Kaminski sent a client an email asking for a meeting.  When the client declined, she nonetheless sent a second email seeking a meeting.

65.     On information and belief, Defendants also have shared personal information of at least one BMO employee, who received a phone call on his personal cell phone related to a loan transfer for a client who was leaving.

66.     To date, at least 23 accounts have been closed and assets withdrawn from BMO, representing approximately $100 million in assets under management, with a resultant loss of revenue to BMO of approximately $875,000 per year.

67.     All of the customers associated with these accounts were BMO clients who had Eimen and/or Kaminski as their wealth or portfolio manager and in every case had been clients at BMO for many years.  None of these clients were carved out in any way from the non-solicitation and non-service obligations in the Eimen and Kaminski Agreements.

68.     Each of the accounts for which money damages are sought has been transferred to William Blair or is in the process of transfer.

69.     Both BMO clients who have transferred their accounts and those who have decided not to despite Eimen and Kaminski's solicitations have reported conduct and comments from the Defendants that establishes that they have used BMO's Confidential Information and trade secrets, and have solicited and serviced customers in blatant violation of their agreements.

70.     Defendants wrongfully used BMO's client identities, contact information, and data to improperly solicit and service BMO clients. This client information was not information about individuals that could be simply identified through public sources. These individuals are clients whom BMO has carefully cultivated by pouring resources over many years into identifying that they are willing and able to invest in the financial services industry and have already done so. They are clients that have a wealth portfolio and have sought out advice from professionals employed at BMO, and whom BMO has identified as having certain investment preferences, investment objectives, financial strategies, and risk tolerances. Without BMO having already compiled their information, Defendants would not know these names immediately upon beginning employment at William Blair nor that they had particular banking and financial service needs.

71.     BMO makes diligent efforts to maintain the secrecy of its client information and prevent it from becoming publicly ascertainable. In addition to having employees such as Defendants sign employment agreements containing confidentiality provisions, BMO takes other measures to secure its client information. For example, BMO strictly monitors all employees' print activity and restricts certain information, such as full client reports, from being printed directly. Wealth advisors are prohibited from printing from their computers at home. The use of USB drives likewise is heavily monitored, and USBs cannot be inserted in most BMO devices.

All of BMO's systems are password protected, using multi-factor authentication, such that they cannot be accessed without appropriate credentials. Finally, all BMO employees, including financial advisors, are required to certify they have read BMO's policies, and must annually re-certify they understand the policies.

72. For these reasons, BMO's compiled client data are not publicly available and are subject to trade secret protection.

**F. BMO Has Been Damaged by Defendants' Breaches of their Agreements.**

73. As noted above, the loss of 23 accounts, so far, has damaged BMO to the tune of approximately $875,000 in lost annual fees.

74. BMO also has suffered and will continue to suffer harms that are incapable of calculation, including the loss of customers and good will. Defendants must be enjoined from any further solicitation of BMO clients to avoid even more harm from their misconduct.

**Count I: Breach of Contract Against Both Defendants**

75. BMO realleges and restates paragraphs 1-74 as if fully stated here.

76. Each Agreement signed by each Defendant is a valid and enforceable contract entered into in exchange for good and valuable consideration.

77. The restrictive covenants in each Agreement are reasonably necessary to protect BMO's legitimate protectible business interests and are reasonable in scope.

78. BMO performed every material obligation it owed to Defendants under their Agreements.

79. Each Agreement prohibits each Defendant from soliciting or servicing BMO customers for a period of one year following the termination of their BMO employment.

80. Each Agreement also prohibits each Defendant from using or disclosing BMO's Confidential Information.

81. BMO has a legitimate business interest in restraining its wealth management employees from appropriating the employer's confidential trade information and customer relationships

82. The non-servicing obligations are appropriately narrowly tailored only to apply to clients to whom each defendant actually provided services and/or whose confidential information was known to them while at BMO.

83. Eimen breached his Agreement by soliciting BMO customers and using BMO Confidential Information to do so and by servicing BMO customers who have moved their accounts to William Blair.

84. On information and belief, Eimen also breached his Agreement by inducing Kaminski to terminate her employment at BMO in order to join him at William Blair, BMO's competitor.

85. Kaminski breached her Agreement by soliciting BMO customers and using BMO Confidential Information to do so and by servicing BMO customers who have moved their accounts to William Blair.

86. BMO has suffered damages in excess of $2 million as a result of Defendants' breaches.

87. In addition, unless Defendants are enjoined from further violating the terms of their Agreements, BMO will suffer irreparable loss and incalculable harm, including the loss of goodwill, customer relationships, the stability of its workforce, and proprietary and confidential information.

88.    BMO lacks an adequate remedy at law and is entitled to injunctive relief.

**WHEREFORE**, BMO asks that this Court enter a judgment in its favor and against Defendants:

(a)  Awarding actual damages arising from the wrongful solicitation and servicing of clients in an amount to be determined at trial;

(b)  Entering an injunction enforcing the terms of each Agreement, including the non-solicitation and confidentiality provisions;

(c)  Awarding BMO its attorney's fees incurred in enforcing the terms the Eimen Agreement; and

(d)  Granting BMO such other and further relief as the Court deems proper and just under the circumstances.

**Count II:  Misappropriation of Trade Secrets**
**in Violation of the Defend Trade Secrets Act (DTSA)**
**18 U.S.C. § 1836 *et seq.***

89.    BMO realleges and restates paragraphs 1-88 as if fully stated here.

90.    BMO was at all relevant times the owner of trade secrets involving the identity, contact and business information, and financial management terms for its customers who Eimen and Kaminski agreed not to solicit or service for a year after leaving their BMO employment.

91.    These trade secrets were used by BMO in order to offer wealth management and other banking services for these customers and were, and are, related to services used in interstate commerce.

92.    The identities, contact and business information, and financial management terms for these customers is not generally known to others in the wealth management industry and certainly would not have been known to William Blair absent Defendants' knowledge of this

information. This information is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use.

93.     Trade secrets can include customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information

94.     Under DTSA, a trade secret can be "all forms and types of financial [or] business, information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

95.     BMO made reasonable efforts to keep the identities, contact and business information, and financial management terms for these customers secret by providing that information only to select individuals within BMO and requiring those employees – including Defendants – by agreement and by BMO policy to maintain the confidentiality of that information.

96.     Defendants were aware of those policies and had a duty under their agreements with BMO to keep this information confidential and not disclose it to or use it for William Blair.

97.     However, Defendants used their knowledge of this information and disclosed it in order to solicit and service BMO customers. They did so with full knowledge that they had a duty not to use or disclose the information.

98.     As a direct and proximate result of Defendants' misappropriation and use, BMO has suffered damages in excess of $2 million.

99.     Defendants' misappropriation of the trade secret information described herein was willful, malicious, and deliberate.

**WHEREFORE**, BMO asks that this Court enter a judgment in its favor and against each Defendant:

(e)  Awarding actual damages in an amount to be determined at trial;

(f)  Entering an injunction enforcing the terms of the Eimen and Kaminski Agreements, including the non-solicitation and confidentiality provisions;

(g)  Awarding BMO punitive damages of two times any award hereunder and attorney's fees and costs incurred as a result of Defendants' intentional and willful conduct; and

(h)  Granting BMO such other and further relief as the Court deems proper and just under the circumstances.

## JURY DEMAND

Plaintiff BMO Harris Bank, N.A. hereby demands trial of this action by jury.


Respectfully submitted,

BMO Harris Bank, N.A.


By:      /s/ *Sarah R. Marmor*_____

Sarah R. Marmor
George D. Sax
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606
Telephone: (312) 726-6000
Email:  smarmor@scharfbanks.com
Email:  salexander@scharfbanks.com

*Attorneys for BMO Harris Bank, N.A.*

18